[No. 47395–1.   En Banc.   January 15, 1982.]

Minnie M. Williams, *Appellant,* Poulsbo Rural Tele-
phone Association, *Respondent,* v. The Bank of
California, N.A., et al, *Respondents,*
Kenneth Clapper, *Appellant.*

*Williams, Lanza, Kastner & Gibbs,* by *William D. Cam-
eron,* for appellant Williams.

*Bassett, Gemson & Morrison,* by *Frank R. Morrison, Jr.,* for respondents Bank of California, et al.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *William A. Helsell,* for respondents Serwold, et al.

[As amended by order of the Supreme Court April 1, 1982.]

HICKS, J.—This matter was previously before the court in *Williams v. Poulsbo Rural Tel. Ass'n,* 87 Wn.2d 636, 555 P.2d 1173 (1976) (*Williams* I), and we remanded for joinder of necessary parties and a new trial. This appeal is from the judgment entered on defendants'/respondents' motion for summary judgment in the second trial and the denial of a similar motion by Williams. The case was certified here by the Court of Appeals.

We must decide, *inter alia,* whether: (1) Poulsbo Rural Telephone Association (PRTA) validly amended its Profit Sharing Plan and Trust Agreement of Poulsbo Rural Telephone Association (Poulsbo Plan) when it added section 6.06; (2) United Telecommunications, Inc. (United), including its subsidiary, United Telephone Company of the Northwest (Northwest), is a successor company to PRTA; and (3) United and Northwest validly amended the Poulsbo Plan to make it part of United's retirement plan.

The principal issue on appeal involves the prior disposition of the corpus of the profit sharing plan and trust established for the benefit of PRTA employees in 1966. We affirm the judgment of the trial court, in part. We also remand for further proceedings.

At the commencement of this action in 1973, plaintiff/appellant Minnie M. Williams was an employee of Northwest. Northwest had acquired the assets of PRTA in January 1972. Williams had been an employee of the PRTA since 1955. As such, she was a participant and beneficiary of the Poulsbo Plan.

In this action Williams seeks, *inter alia,* to obtain pos-

session of her participatory share of the Poulsbo Plan trust assets and to have a declaratory judgment that she is a member of United's pension system with full seniority credit for her PRTA service.

February 11, 1971, United offered in writing to acquire PRTA. As a part of its invitation, United proposed that regular PRTA employees would be offered comparable positions with Northwest and would be included in the company benefit programs. The proposal was as follows:

3. This offer contemplates that after the closing date of the proposed agreement, all employees, employed by Poulsbo at the time of closing on a permanent or regular basis, will be included in the United System Employee Retirement Plan and will also be included in the insurance and other employee benefit programs of United. In addition, subsequent to the closing date of the proposed agreement, Poulsbo's existing Profit Sharing Plan and Trust Agreement dated as of January 1, 1966, as amended, with the Bank of California, N.A., as trustee, will be amended *to continue* as the United System Employee Retirement Plan *and* such employees of Poulsbo will be given credit for pension purposes for the years of service with Poulsbo.

(Italics ours.) PRTA employees who continued employment with Northwest would be granted seniority credit in United's retirement plan for their service with PRTA. It is to be noted that United proposes a future amendment of the Poulsbo Plan to continue it as the United System Employee Retirement Plan.

PRTA agreed to an exchange of its assets for United's stock. May 28, 1971, an Agreement and Plan of Reorganization was adopted by PRTA, United and Northwest. It provided in part:

The parties to this Agreement desire to adopt a plan of reorganization within the meaning of Section 368(a)-(1)(C) of the Internal Revenue Code of 1954 as amended, whereby all of Poulsbo's assets will be transferred to Northwest in consideration of (i) the issuance to Poulsbo of shares of United common stock and (ii) the assumption by Northwest of the liabilities and obligations of

Poulsbo normally incurred and arising out of the ordinary course of telephone operations . . .

Consistent with United's proposal of February 11, paragraph 12 of the agreement dealt with the questions of employee benefits under the reorganization and provided in part:

As employees of a subsidiary of United, the permanent or regular operating personnel of Poulsbo shall be offered positions substantially comparable to those presently held in Poulsbo, . . .

As employees of Northwest, all employees, employed by Poulsbo at the time of Closing on a permanent or regular basis will be eligible for and will be offered certain benefits available to employees of United and its other subsidiaries from time to time. These benefits include

(a) United System Employee Retirement Plan (subsequent to the closing date of this Agreement, Poulsbo's existing Profit Sharing Plan and Trust Agreement dated as of January 1, 1966, as amended, with the Bank of California, N.A. as Trustee, will be amended to continue as the United System Employee Retirement Plan and all such permanent or regular employees of Poulsbo will be given credit for pension purposes for the years of service with Poulsbo);

. . .

(c) Such other benefits as may from time to time be available under established United policy.

The provision specifying inclusion in the United System Employee Retirement Plan for former PRTA employees is tied with continuing the Poulsbo Plan as part of the United System Employee Retirement Plan.

Consistent with United's original proposal and in accordance with paragraph 12 of the Agreement and Plan of Reorganization, PRTA on December 31, 1971, purported to amend the Poulsbo Plan by adding section 6.06 which provides:

"6.06. Vesting and Continuation of Plan upon Sale of Assets. Notwithstanding any other provision herein to the contrary, immediately prior to the Closing the rights of all participating employees shall fully vest and become

nonforfeitable, and upon the Closing no further contributions shall be made to the Trust Fund by the Company for any period subsequent to the end of 1971, but the Plan, the Trust and the Trust Fund shall otherwise continue in full force and effect, as an independent Plan, Trust and Trust Fund, and employment with Northwest or United shall be deemed employment with the Company for purposes of the Plan, including the provisions of Sections 5.01 (Distribution upon Retirement), 5.03 (Distribution in Event of Total Disability) and 5.04 (Withdrawal from Plan). No distribution shall be made from the Trust Fund to any participating employee or his personal representative until such employee dies or such employee's employment by Northwest or United is terminated."

. . .

3. The following new clauses (f), (g) and (h) are added to the Definitions under the plan:

" . . .

"(f) The term 'United' shall mean United Utilities, Incorporated.

"(g) The term 'Northwest' shall mean United Telephone Company of The Northwest.

"(h) The term 'the Closing' shall mean the time of the transfer to Northwest or United of substantially all the assets of the Company."

The purpose of adding section 6.06 to the Poulsbo Plan was to make possible the ultimate implementation of that portion of paragraph 12 of the Agreement and Plan of Reorganization that relates to continuing the Poulsbo Plan as the United System Employee Retirement Plan. This was attempted to be accomplished November 14, 1972, when United adopted "Appendix S" to its retirement plan. This amendment formally extended to former PRTA employees the right to participate in United's plan as did a like amendment, later adopted by Northwest, both of which amendments also purported to amend the Poulsbo Plan in its entirety to make it a part of United's retirement plan. The Northwest amendment authorized and directed the trustee, The Bank of California, N.A. (Bank), to transfer the Poulsbo Plan corpus to United's retirement plan fund.

This the Bank did, without notice to any of the plan participants. We are unable to accede to this procedure in its entirety.

Section 6.01 of the Poulsbo Plan reserves to settlor company the power to amend the trust and provides the method as follows:

6.01 Amendment. The Company shall have the right at any time, and from time to time, to amend, in whole or in part, any or all of the provisions of this Agreement. However, no such amendment shall authorize or permit any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to purposes other than for the exclusive benefit of the participants or their beneficiaries or estates; no such amendment shall cause any reduction in the share or interest theretofore credited to any participant, or cause or permit any portion of the Trust Fund to revert to or become the property of the Company; and no such amendment which affects the rights, duties or responsibilities of the Trustee may be made without the Trustee's written consent. Any such amendment shall become effective upon delivery of a written instrument executed by order of the Board of Directors of the Company, to the Trustee, and the endorsement by the Trustee of its receipt or of written consent thereto, if such consent is required.

Our threshold inquiry is whether the Poulsbo Plan was successfully amended December 31, 1971, when section 6.06 was purported to be adopted. Williams contends it was not and that the plan terminated on that date. The method of amendment was challenged by Williams as not strictly following the provisions of section 6.01. The trial court in its November 26, 1979, letter order to the parties held that section 6.06 was validly adopted. If section 6.06 is not valid, the entire plan to utilize the Poulsbo Plan corpus to partially fund the obligation flowing from seniority service credit granted former PRTA employees in United's retirement system topples.

We believe that when the PRTA board of directors adopted section 6.06 as an amendment to the Poulsbo Plan,

strict compliance with section 6.01 did not occur. Thus the questions are: (1) will substantial compliance suffice? and (2) if so, was there substantial compliance with section 6.01 in this instance? We answer both questions in the affirmative.

"Substantial" is an adjective frequently found in law. It is used in conjunction with such words as "evidence", "damages", "performance", "justice", and others. In each instance "substantial" connotes "Considerable in importance, value, degree, amount, or extent". *See Illustrated Heritage Dictionary and Information Book* (1977). "Compliance" is defined by the same authority as "yielding to a wish, request or demand; acquiescence". We would define substantial compliance in this instance to mean "closely in conformance" with the requirements of section 6.01.

"Substantial compliance" is a familiar concept in insurance litigation concerned with changes of beneficiaries. In *Allen v. Abrahamson,* 12 Wn. App. 103, 529 P.2d 469 (1974), the Court of Appeals discussed a number of cases in which substantial compliance meant that the insured had done everything required by the insurance policy that he could do to change the beneficiary and that only the ministerial acts of the insurer were needed to effect the change. The court explains at page 107:

> The rule requiring substantial compliance with the policy terms in effectuating a change of beneficiary becomes necessary for the purpose of demonstrating with a high degree of certainty that the deceased insured unequivocally desired to make that change, and that he did not some time thereafter abandon his purpose by failing to take affirmative steps to carry out his intent.

In a dispute over insurance proceeds following an insured's death, considerable import may be placed on the extent to which the insured complied with the policy provisions for changing a beneficiary to assure that the insured indeed intended that there be such a change. Here, there is no question concerning intent, requiring unyielding con-

formance to section 6.01 in this instance would only frustrate intent.

That PRTA intended that it be able to amend the Poulsbo Plan from time to time follows from the very fact that section 6.01 was included in the original plan and agreement. That it intended to add section 6.06 in this instance was indicated at least as early as its acceptance of United's offer to acquire PRTA. The amendment process utilized by the PRTA board of directors in adopting section 6.06 generally followed the directions of section 6.01. Copies of the amendment had been sent to the trustee Bank the day before it was adopted and the copies were signed by a Bank trust officer and returned to PRTA. Following formal adoption of the amendment at year's end by the PRTA board of directors, a copy of section 6.06 was returned to the trustee Bank on January 3, 1972. The presence of the Bank's routine routing stamp on the accompanying cover letter indicates that at least the letter was received. Formal endorsement of the amendment by the Bank's trust administrative committee, however, did not occur until December 20, 1972, almost a year after the amendment's adoption.

The trial court found the amendment provisions of section 6.01 were substantially complied with when section 6.06 was adopted and fully complied with when the trustee Bank's trust administrative committee subsequently acted to endorse the amendment. The amendment was held to be valid. We agree that substantial compliance was achieved, i.e., the procedure followed closely conformed with the requirements of section 6.01. Those provisions that were less closely followed were for the benefit of the trustee Bank which is not a complainant in this action. Williams cannot rely on a provision that obviously was for the benefit of the trustee, not the participant employees. See A. Scott, Trusts § 330.8, at 2607 (3d ed. 1967).

Williams contends, however, that there is no such concept in this state as substantial compliance in amending a trust agreement when the trust instrument provides the

method for its amendment. She cites *In re Estate of Button,* 79 Wn.2d 849, 490 P.2d 731 (1971), as authority that only strict compliance will suffice in such an instance. We disagree. *Button* concerns the rule regarding revocation of a trust. As set forth at page 852:

> The rule is that the settlor of a trust has the power to revoke the trust if and to the extent that, by the terms of the trust, he reserved such a power. Where the trust instrument specifies the method of revocation, only that method can be used.

(Citations omitted.) Assuming the rules concerning revocation and alteration or modification of a trust are the same (A. Scott, *Trusts, supra* § 331, at 2618), we do not believe *Button* forecloses the concept of substantial compliance.

In *Button,* a trust agreement specified that it could be revoked or modified by an instrument in writing, signed by the trustor and delivered to the trustee. Button signed such instruments, but they were never delivered to the trustee nor was anyone instructed to deliver them to the trustee. Here, as is noted above, the procedure used in adopting the amendment followed rather closely the method provided in the trust agreement.

We hold that substantial compliance with section 6.01 occurred when the PRTA board of directors adopted section 6.06 and that substantial compliance is sufficient to validate the amendment.

Next, Williams contends that even if section 6.06 was a valid amendment, Northwest had no authority to amend the Poulsbo Plan as Northwest was not truly a successor company, as defined under section 6.05. We disagree.

Section 6.05 provides:

> Successor Company. In the event that the Company is taken over by a successor who agrees to continue the Profit–Sharing Trust, the employment of any employee who is continued in the employ of such successor shall not be deemed to have terminated or severed for any purposes hereunder.

The trial court found "The United Companies are suc-

cessor companies pursuant to Section 6.05 of the PRTA Plan . . ." Section 6.06 treated United and its subsidiary Northwest as a successor company when it provided ". . . and employment with Northwest or United shall be deemed employment with the Company for purposes of the Plan . . ."

Technically, United's acquisition of PRTA was a sale of assets in an exchange for stock transaction, a reorganization within the meaning of Title 26, § 368(a)(1)(C) of the Internal Revenue Code of 1954. In substance, however, it operated as a merger or consolidation. More importantly, a number of documents relating to the Agreement and Plan of Reorganization indicate that United (including Northwest, its subsidiary) was to be a successor company. In the initial proposal of United, found in the February 11, 1971, letter to the president and board of directors of PRTA, it was expressly stated that United wanted PRTA to become a part of the United system. The parties, in effect, contemplated that the takeover would essentially involve little more than a change in the name on the door. Moreover, the PRTA employees were to continue as United employees, be eligible for all of the employee benefit programs of United, and were to be given seniority credit for pension purposes for their years of service with PRTA.

In our view, United, including its subsidiary Northwest, was a successor company to PRTA. As a successor company it became the "Company" under section 6.01 and, thus, was empowered to further amend the Poulsbo Plan to the extent the provisions of the plan permitted.

Next, Williams challenges the validity of "Appendix S" on the ground that it violated the exclusive benefit rule provided in the trust and reduced the beneficiaries' shares. Section 6.01 of the Poulsbo Plan trust agreement provides that no amendment shall permit any part of the trust fund to be used for purposes other than for the exclusive benefit of the participants or their beneficiaries, or cause any reduction in the share of each participant.

The affidavits of actuary Richard S. Raskin, submitted

on behalf of respondents, indicated that the amendment of the Poulsbo Plan making it part of the United retirement plan and extending its benefits to PRTA employees conferred an enhanced benefit to Williams and to other Poulsbo Plan participants.

Raskin's computations are based on accepted pension valuation criteria, specifically those of the Pension Benefit Guaranty Corporation, a corporation within the United States Department of Labor organized to guarantee pensions. After reading the affidavits filed on behalf of Williams, the trial court refused to consider them as they were untimely and unresponsive. However, the trial court accepted Raskin's affidavits as actuarially sound and found that no material disputed issue of fact existed regarding the violation of the trust's exclusive benefit rule.

Next, Williams asserts that she was never advised of the proposed utilization of the Poulsbo Plan trust fund as part of United's retirement plan fund prior to the PRTA takeover by Northwest and her employment with the new company. For that reason she claims to have been prejudiced because she was foreclosed from raising timely objection to such use of the Poulsbo Plan trust fund.

The trial court made no finding on the issue of Williams' knowledge. Regardless of what she knew prior to January 1, 1972, and her employment with Northwest, she became aware of the material facts within the ensuing year. From that time Williams has maintained that she is entitled to have both immediate distribution of her Poulsbo Plan profit sharing account balance and seniority credit in United's retirement system covering her PRTA service.

We hold to the contrary. We agree with the trial court that Williams may not have possession of her participatory share of the Poulsbo Plan profit sharing trust fund and also require United, based on the agreement it entered with PRTA, to grant her seniority credit in its retirement system for her PRTA service. Impliedly, if not explicitly, seniority credit for PRTA service was conditioned on the Poulsbo Plan trust assets partially funding United's obligation fol-

lowing the granting to former employees credit for service in PRTA.

Lastly, plaintiff contends that the trial court erred in striking plaintiff's amended complaint against the PRTA directors/officers. Although the new claim alleging that the PRTA directors/officers were jointly liable should have been filed within 3 years under RCW 4.16.080(4) to avoid a bar of the statute of limitations, Williams asserts the statute was tolled by virtue of the appeal in *Williams* I. *See* RCW 4.16.230 and .240.

The new complaint adding affirmative allegations against the PRTA directors/officers failed to comply with CR 15, since Williams did not receive express leave of this or the trial court to so amend her complaint. For this reason, the decision of the trial court is sustainable. But, since we hold the actions of PRTA, its officers, and directors to be valid in adding section 6.06 as an amendment to the Poulsbo Plan, there is no basis for the complaint.

We have upheld the agreement and the amendments flowing therefrom providing for a limited utilization of the Poulsbo Plan trust assets partially to fund the pension obligation United created for itself when it granted seniority credit in its retirement plan to former PRTA employees for their service with PRTA. It does not follow from this holding, however, that removal of the trust fund from this jurisdiction and its commingling with the assets of the United retirement plan fund is upheld.

The Poulsbo Plan may be amended from time to time by the company provided that the trust fund is not thereby used or diverted other than for the exclusive benefit of the participants or their beneficiaries. *See* Poulsbo Plan Agreement § 6.01. Commingling the trust fund and its earnings with United's retirement fund is not in accord with this provision and neither United nor Northwest may modify the plan and agreement to so provide. Section 6.06 fully vested all participants in the profit sharing plan and trust agreement as of December 31, 1971. Also, we note that United's "Appendix S" amendment purports to determine

Poulsbo Plan member account balances as of October 31, 1971. We see no reason why the account balances should not be determined as of December 31, 1971, rather than October 31.

Section 6.06 further provided that "the Plan, the Trust and the Trust Fund shall otherwise continue in full force and effect, as an independent Plan, Trust and Trust Fund . . ." We construe that language to mean that the trust fund must be held and maintained as a separate fund. It follows that such fund may not be commingled with other funds except as the trustee has been authorized to do in section 1.05 of the trust agreement, not applicable here.

We can conceive the Poulsbo Plan trust corpus to be part of United's retirement plan fund only when that corpus is maintained as a separate and independent fund. We agree individual account balances may be utilized to pay United's retirement obligations to retiring former PRTA employees, leaving United's retirement plan fund to take over when a retiree's Poulsbo Plan account is exhausted. We cannot, in light of sections 6.01 and 6.06, conceive of the trust fund as a fungible or undivided part of United's retirement fund, without the consent of the Poulsbo Plan participants or their beneficiaries. Absent such consent, the Poulsbo Plan trust corpus must remain a separate and independent fund held in and administered under the laws of the State of Washington in order that it is at all times available for pro tanto distribution to any vested participant who becomes eligible to receive his or her account balance.

Since the trust corpus must be held as a separate and independent fund, its earnings belong to and must remain with it, not transferred to United's retirement plan fund. *See Lynn v. Longview,* 15 Wn.2d 528, 533, 131 P.2d 164, 143 A.L.R. 1336 (1942). Although the Poulsbo Plan trust corpus was frozen on December 31, 1971, in the sense that no further contributions were to be made to it by the company, that did not authorize earnings attributable to that trust fund diverted to United's retirement plan fund.

United shall return to the state of Washington the

Poulsbo Plan trust fund as the trial court finds it to have existed on December 31, 1971, after all contributions for the year 1971 are included. Earnings thereon in an amount to be determined by the trial court, but not less than the historical earnings of the United retirement plan fund during the period concerned, shall likewise be returned.

We are uncertain whether the Poulsbo Plan trustee Bank was ever effectively discharged from its duties. The trial court shall, in its discretion, continue the same trustee or select another.

We agree with Williams' contention that the fees the trustee Bank paid itself before transferring the Poulsbo Plan trust fund should not be allowed in this instance because of its breach of fiduciary duty. The Bank either negligently or willfully breached its fiduciary duty when, without any prior notice to the beneficiaries, it transferred the corpus of the Poulsbo Plan trust to United's retirement plan fund in Kansas. *See Esmieu v. Schrag,* 88 Wn.2d 490, 499, 563 P.2d 203 (1977). Judgment should be entered in the trial court against the Bank in the amount of the fees, plus interest thereon at the legal rate for judgments from the date of payment to itself until the date of repayment to the trust corpus.

Except as provided herein, the trial court is affirmed, and the case is remanded for further proceedings as indicated.

BRACHTENBACH, C.J., ROSELLINI, STAFFORD, UTTER, DOLLIVER, WILLIAMS, and DIMMICK, JJ., and THOMPSON, J. Pro Tem., concur.

Reconsideration denied April 1, 1982.